**REED–UNION CORPORATION,**
Plaintiff,

v.

**TURTLE WAX, INC., Defendant.**

No. 91 C 5625.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 15, 1994.

Opinion Supplementing Decision
Dec. 13, 1994.

John J. Arado, Craig S. Fochler, John Sheldon Letchinger, Wildman, Harrold, Allen & Dixon, John Bostjancich, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Patricia Susan Smart, Chicago, IL, for plaintiff.

J. Patrick Herald, Kevin C. Parks, Philip J. Zadeik, David Jonathan Davis, Baker & McKenzie, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

For nearly twenty years, Reed Union has owned and marketed a polish for automobiles styled "NU FINISH." NU FINISH received trademark protection in the mid–1970s. NU FINISH has always been marketed in an orange plastic bottle with black lettering including the name NU FINISH on the upper half of the bottle, and a series of claims about the product on the bottom half (the trade dress). For most of its life, NU FINISH was a minor player in the car wax market. Although Reed Union had always advertised the product on television extensively (one to one and one-half million dollars per year), its sales during the first ten or eleven years remained stagnant. All of that changed in the late 1980s when Reed Union, for the first time, was successful in placing NU FINISH in national mass marketing retail stores such as K–Mart. Thereafter, NU FINISH sales mushroomed until, in 1991, they reached some sixteen million dollars.

Enter Turtle Wax. Throughout the 1970s and 1980s, Turtle Wax had been perhaps the undisputed leader in the car wax market. It had retained that position in part by keeping track of its competitors and developing new products to compete with any interlopers (more about this later). Turtle Wax had largely ignored Reed Union and its NU FINISH because of its low volume of sales. By 1989, it could afford to do so no longer. After its effort to market a new and improved Turtle Wax hard-shell finish in 1989 failed to affect NU FINISH's growing market share, Turtle Wax created a new brand of car wax. It is uncontested that this new product was designed in large part to compete directly against NU FINISH. Turtle Wax's new product was named "FINISH 2001," and Turtle Wax quickly obtained a trademark on that name. The trade dress for FINISH 2001 was created by Turtle Wax's art department (Mr. Campagnolo) with help from its marketing department (Mr. Cusack). FINISH 2001 is in a fluorescent green bottle (somewhat larger than NU FINISH's orange one). The green bottle also has a somewhat different shape. Turtle Wax selected a fluorescent orange-red label (called scarlet by Mr. Campagnolo) and black lettering. FINISH 2001 was successful. Its sales grew steadily if not remarkably in 1990 through 1993. In that same period, NU FINISH sales declined.[1]

---

1. Most of the facts discussed in this introductory section are uncontested. To the extent they are not, they are findings of fact by the Court.

The battleground was set. NU FINISH sued Turtle Wax on several different theories, all of which essentially claim that the name and trade dress of FINISH 2001 caused confusion among consumers and pirated NU FINISH sales. Although this Court's decision on Turtle Wax's motion for summary judgment disposed of some counts, the case proceeded to trial before this Court without a jury on Count I, captioned unfair competition and trademark infringement. This count is a potpourri of claims including a violation of section 1125(a) of the Lanham Act, 15 U.S.C. § 1125(a) trademark infringement in violation of 15 U.S.C. §§ 1051–1127 and claims of unfair competition and deceptive trade practices under various state laws. All of these claims have a single theme—the name, trade dress, and promotion of Turtle Wax's FINISH 2001 is confusingly similar to that of NU FINISH, a confusion that has cost Reed Union millions of dollars in sales.

### The Likelihood of Confusion Between NU FINISH's Mark and Trade Dress with that of FINISH 2001

■ The touchstone of trademark infringement analysis is "likelihood of confusion," a deceptively simple test. The Seventh Circuit has developed seven factors to evaluate this likelihood of confusion. They are:

1. the similarity between the marks in appearance;
2. similarity of the products;
3. area and manner of concurrent use;
4. degree of care likely to be exercised by consumer;
5. strength of complainant's mark;
6. actual confusion;
7. intent of defendant to palm off his product as that of another.

*Smith Fiberglass Prod., Inc. v. Ameron, Inc.,* 7 F.3d 1327 (7th Cir.1993), *quoting AHP Subsidiary Holding Corp. v. Stuart Hale Co.,* 1 F.3d 611, 616 (7th Cir.1993). None of these seven factors alone are dispositive, and

the weight accorded to each factor will vary from case to case. *Schwinn Bicycle Co. v. Ross Bicycle, Inc.,* 870 F.2d 1176, 1187 (7th Cir.1989). With this in mind, we consider the critical factors (although somewhat out of order).

### I. Similarity of Products and Area and Manner of Concurrent Use

■ FINISH 2001 and NU FINISH are both car polishes. Each is priced in the five to six dollar range and competes with the other. Each makes similar claims—for example, a once-a-year car polish that has a high shine and excellent protective qualities. When the marks and trade dress in question are used on directly competitive products sold through the same channels of trade, less similarity is required between the marks to establish confusion. *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 377 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). These two factors clearly favor NU FINISH. The remaining factors must be evaluated in light of this highly competitive position.

### II. The Strength of the NU FINISH Trademark and Trade Dress

■ We next consider the strength of the NU FINISH trademark and trade dress.[2] The term "strength" of a trademark refers to the distinctiveness of the mark or more precisely, its tendency to identify the goods sold as coming from a particular source. *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Strength of the mark is a crucial factor in the likelihood of confusion analysis because the stronger the mark, the broader protection to which it is entitled. Similarly, the converse is true.

■ In evaluating the strength of the mark, we must consider the mark's conceptual and commercial strength on a spectrum ranging from generic to descriptive to suggestive to fanciful or arbitrary. *Kozak Auto Drywash, Inc. v. Enviro-Tech Int'l,* 823

---

2. Granted, Reed Union's trademark "NU FINISH" has become uncontestable. 15 U.S.C. 1065. However, uncontestable status does not speak to the strength of the mark or make an otherwise weak mark strong. *Kozak Auto Drywash, Inc. v. Enviro-Tech Int'l,* 823 F.Supp. 120 (W.D.N.Y.1993).

F.Supp. 120, 123 (W.D.N.Y.1993). A generic term cannot achieve trademark status despite whatever promotion effect may have been expended to exploit it. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).

 Turtle Wax argues that the mark "NU FINISH" is generic. It points out that the term "NU" or correctly spelled "NEW" is so commonly used that it is incapable of distinguishing the source of products. *R.J. Reynolds Tobacco Co. v. Brown & Williamson Tobacco Corp.*, 226 U.S.P.Q. 169, 176 (TTAB 1985). Similarly, the word "FINISH" is generic in the sense that it is synonymous with car wax or polish. Thus, the name NU FINISH and its claims of "The Once A Year Car Polish," and "no rubbing, no buffing" simply denominate a type or category of goods. In this sense, the argument goes, NU FINISH is like the name "Wash Wax," which is generic and not registerable. *Turtle Wax, Inc. v. Blue Coral, Inc.*, 2 U.S.P.Q.2d 1534 (TTAB 1987). We are only partially convinced by this argument. We agree that the claims "Once a Year Car Polish" and "no rubbing or buffing" is not entitled to protection. Those phrases simply define a central characteristic of car waxes in general, and as such are merely generic. *See Union Carbide Corp. v. W.R. Grace & Co.*, 213 U.S.P.Q. 400, 411 (TTAB 1982). To hold otherwise would deprive all car polish manufacturers of claims of a long lasting product or easy applications. This would impoverish the language and cannot be sanctioned. *Loctite Corp. v. National Starch & Chem. Corp.*, 516 F.Supp. 190, 201 (S.D.N.Y.1981). However, the name NU FINISH is different. As used to describe a car polish or wax, it does not convey the same concept as if it were used to describe a furniture finishing product. While there maybe other car polishes that use the name "FINISH," few have any measurable market share. Referring to a car wax or polish as a new finish is, we conclude, not simply generic the way new wax or new polish would be.

Having said this, however, we also conclude that the mark "NU FINISH" is not fanciful or even suggestive. Rather, on the continuum of protectability, it is a descriptive mark, i.e., it makes a car's finish appear new. Although the distinction between suggestive and descriptive is somewhat blurred, the Seventh Circuit has distinguished the two concepts as follows:

> [I]f the mark imparts information directly it is descriptive. It stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive. If the notion is that the more imagination that is required to associate a mark with a product the less likely the words used will be needed by competitors to describe their products.

*Union Carbide v. Ever–Ready, Inc.*, 531 F.2d at 377.

Thus, we conclude NU FINISH is a descriptive mark. It imparts information or a claim of an extraordinary nature. This product will create a new finish for your car. The mark is weak but protectable.

 The trade dress of NU FINISH is a more interesting question. Reed Union must prove that its packaging and its commercial are inherently distinctive or have acquired a secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). In examining the trade dress, we must consider whether it is a common or basic shape or design, whether it is unique or unusual in part or whether it is a mere refinement of commonly adopted and well known forms or ornamentation for a particular class of goods. *Seabrook Foods, Inc. v. Bar–Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977). We must also examine the elements of the trade dress to determine if they are arbitrary and nonfunctional. Otherwise, the trade dress is not inherently distinctive. *Chevron Chem. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).

 NU FINISH markets its car polish in a standard size plastic bottle, which is orange with a white cap. NU FINISH also uses black lettering for its name on the top half of the bottle with text on the bottom half describing its performance. Its black and

orange presentation, with its lengthy text describing the features of the polish, were somewhat different from anything else in the car polish field until the introduction of FIN-ISH 2001. However, color alone cannot be protected as trade dress. *Nutrasweet Co. v. Stadt Corp.*, 917 F.2d 1024 (7th Cir.1990), *cert. denied*, 499 U.S. 983, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991).

■■■■ Does all of this equate to a distinctive or arbitrary trade dress? A trade dress is not inherently distinctive even where it is unusual or even unique in the industry. Common forms of presentations in a particular field of competition are not protected. *Turtle Wax, Inc. v. First Brands Corp.*, 781 F.Supp. 1314, 1321 (N.D.Ill.1991). Further, trade dress, which is merely descriptive, will not survive attack. *A.J. Canfield v. Vess Beverages, Inc.*, 796 F.2d 903 (7th Cir.1986). We conclude that the trade dress of NU FINISH does not pass the *Seabrook/Chevron* tests. Its presentation of name and claims albeit in black lettering on an orange bottle is not distinctive. It is functional and non-arbitrary.

■■■■ However, NU FINISH may have acquired a secondary meaning. A secondary meaning exists when the primary significance of the mark or dress in the mind of the consuming public is not the product but the producer. *Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786 (N.D.Ill.1990). Put another way the public must associate the mark or dress with a single source. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir.1982). We believe NU FINISH passes this test. NU FINISH had been advertised on television for fifteen years with expenditures of over one million dollars each of those years. The eye catching television commercial (which this Court ruled earlier was not itself entitled to protection because it was a copy of an earlier Star Brite commercial) over the years helped to create this secondary meaning. Further evidence of secondary meaning is found in the remarkable growth in NU FINISH sales after its introduction into the mass retail chains. NU FINISH became a leader in the car polish industry by the early nineteen nineties. NU FINISH also market-

ed additional products with the NU prefix for a car wash and a vinyl protectant. While there is no direct evidence (such as a survey) on secondary meaning, we believe NU FINISH, which was marketed over eighteen years, advertised extensively, and finally became a leader in the car polish market, had acquired a secondary meaning by the late 1980s. Consumers associated it with a single manufacturer—Reed Union. As such it is entitled to protection against unfair competition.

### III. *The FINISH 2001 Mark, Its Trade Dress and Its Similarly to NU FIN-ISH*

■■■■ There can be no question that FIN-ISH 2001 was designed specifically to compete with NU FINISH. All of the Turtle Wax officers and employees who testified admitted exactly that. However, such competition is unlawful only if it interferes with the consumer's ability to identify the source of the goods by their appearance and packaging. *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir.1994); *citing Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429–30 (7th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

■■■■ We may begin by examining the two competing products. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Side-by-side comparison is proper when the goods are sold side-by-side. *Lever Bros. Co. v. Winzer Co.*, 51 CCPA 930, 326 F.2d 817, 140 U.S.P.Q. 247 (1964). FIN-ISH 2001 is in a fluorescent green bottle. It is somewhat larger than that of NU FINISH and is shaped somewhat differently. It has a fluorescent green top rather than NU FIN-ISH's white one. The similarity, to the extent there is one, is the label of FINISH 2001. It is orange-red or perhaps scarlet, as suggested to by Mr. Campagnolo, its creator. We believe the FINISH 2001 fluorescent orange-red label is noticeably different from the rather flat orange used by NU FINISH. FINISH 2001 also uses black lettering and has its name on the top of its label and claims on the bottom. However, the claims

are not textual as in NU FINISH but rather "catch phrases". Each is set off by brackets or pin points. There are other differences as well. We believe the FINISH 2001 trade dress, while it has some important common features, is noticeably different from the NU FINISH dress. Further, the marks NU FINISH and FINISH 2001 are different as well, sharing only the word "FINISH." The lettering or presentation of the letters are different. NU FINISH has lower case letters while FINISH 2001 is all capitals. We hold that the marks are not confusingly similar, a conclusion borne out by the fact that the trademark office issued a trademark for FINISH 2001 without even citing to NU FINISH. Thus, we conclude that while there are some similarities (orange background and black lettering) there are substantial differences (most importantly the fluorescent green bottle). The overall impression of FINISH 2001 is a futuristic presentation, a presentation not attempted in the mark or trade dress of NU FINISH. We conclude the presentation is not very similar, a factor favoring Turtle Wax.

### IV. Degree of Care Exercised by Consumers in Making Purchases of NU FINISH and FINISH 2001

The parties presented little, if any, evidence on this point. The competing products sell in the range of five to seven dollars. When the competing products are relatively low priced, the likelihood of confusion is increased. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993). However, the Court accepts the testimony of the Defendant's marketing expert, that the inexpensive product (polish) is being applied to a very expensive possession (a car), and the purchase is not the same as a simple purchase of an inexpensive item. Purchasers of premium automobile appearance products will exercise some care and are less likely to be confused by similarities in the parties' mark. *Turtle Wax, Inc. v. First Brands Corp.*, 781 F.Supp. 1314, 1326–27 (N.D.Ill.1991). Moreover, where components of a mark such as finish or wax or polish are widely used with automobile products, the public may have a greater ability to distinguish slight differences even if the

goods are related. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987); *Telemed Corp. v. Tel–Med, Inc.*, 588 F.2d 213, 219 (7th Cir.1978). Thus, we believe some modest care is exercised by the consumer. Both NU FINISH and FINISH 2001 identify their manufacturer, albeit on the rear of the bottle. Anyone who takes the trouble to read the package labels will know the two products are made by different manufacturers. We conclude some care is exercised by the consumers and some care will help in telling the difference between the two products.

### V. Actual Confusion Between NU FINISH and FINISH 2001

Both NU FINISH and FINISH 2001 are leaders in the car polish market. Millions of those products are sold every year. Both Reed Union and Turtle Wax receive hundreds, if not thousands, of letters and phone calls each year commenting on or discussing their products. Yet Reed Union was unable to produce a single written document from a customer or a retailer evidencing confusion. Turtle Wax produced none either, but was able to find several letters from customers that rather clearly demonstrated the particular writer was aware of the different manufacturers of NU FINISH and FINISH 2001.

Reed Union through its president, Mr. Goldman, and several of its own marketing representatives testified to several little vignettes (some ten or so in number) relating the existence of confusion with its customers. These stories have several problems. First, consider what Reed Union did not prove through their vignettes. No customer or retailer was called to testify to confusion. Rather, all but one or two of the stories came from individuals who recounted out-of-court conversations with others. The Court admitted these conversations either as nonhearsay (inferential proof of the out-of-court declarant's state of mind) or when a direct assertion of the state of mind of the declarant was made as an exception under F.R.E. 803(3). Yet, we believe they are entitled to little, if any, weight. *Smith Fiberglass Prod., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1331 (7th Cir. 1993). Some of the stories are inherently

unbelievable on their face—for example, the story of an elderly gentleman in Massachusetts who approached a Reed Union sales representative at a gas station to compliment him on the shine on his car. The Reed Union representative said, "Why I use NU FINISH," to which the old gentleman responded, "I do too, but I don't get the same shine." The old gentleman then went to the trunk of his car where he produced FINISH 2001. This story might be a fine commercial, but it is inherently unbelievable to this Court. To the extent that actual "confused" customers were known and identified by this testimony, none testified in the trial. At least one witness's testimony (an investment advisor to Mr. Goldman) was destroyed on cross-examination. All of the witnesses were financially interested in the outcome of the case—Mr. Goldman, his sales representative and his financial consultant. We reject all this testimony and accordingly find no credible evidence of actual confusion to have been presented by the Plaintiff through its officers, employees, salesmen, and business associates.[3]

Turtle Wax presented evidence of meetings with its retailers, introducing FINISH 2001. None suggested that the name or packaging was confusing, and a few criticized the dress as ugly. We give this testimony some limited weight.

### The Market Surveys

■ Each side also presented a survey. Reed Union's was done by Mr. Whitcup, who had fine credentials. His survey found that nearly twenty-eight percent of the interviewees selected NU FINISH as the manufacturer of FINISH 2001. Mr. Whitcup found little "noise" (confusion by the consumer not caused by NU FINISH/FINISH 2001 similarity). Turtle Wax's expert, Dr. Lavidge, also found confusion in slightly more than twenty percent of his interviewees, but also found that the noise was even greater. Thus, Turtle Wax's expert concluded that there was no actual confusion in the market

place. We must decide which to accept. We choose the Turtle Wax survey.

Both surveys used essentially the same methodology. Shopping malls in large metropolitan areas throughout the continental U.S. were selected. Interviewees were screened to see if they had purchased car wax within the last year. Between four and five hundred people were selected in each survey. Each survey used a test group and a control group.

Our principal reason for rejecting the Whitcup survey is the selection of the product shown the control group in order to determine the noise. As explained by both Dr. Whitcup and Dr. Lavidge, a control group is essential to determine the noise— the inherent confusion in the market which exists independently of and thus is not caused by confusion between the products being tested. Each survey had a control group set up for the purpose of determining the "noise". Under the survey methodology the noise level is subtracted from those who confuse the tested products. Dr. Whitcup's selection of his product was an Armor-all product with the maker's name Armor-all prominently displayed on the polish product. Yet the test was to determine the existence of confusion between NU FINISH and FINISH 2001, neither of which displayed the manufacturer's name except in small print on the rear of the bottle. As testified to by Plaintiff's expert, Dr. Whitcup's control product could not measure inherent confusion in the marketplace because it prominently identified the maker. The control group using Armor All simply selected other Armor All products, all of which also had that name prominently displayed on the front of the container. As a result, the survey showed a *de minimus* noise level. This result is particularly difficult to accept given our earlier finding that only a modest amount of care is used in selecting these low-price items.

We have more confidence in the Defendant's survey which while also showing twenty percent confusion was able to demonstrate that was the approximate amount of noise in

---

**3.** This discussion is not meant to be exhaustive. We have considered all the so-called actual instances of confusion and reject them. In many cases, it would have been possible to corroborate the stories of the interested witnesses. This was not done.

the market. (Dr. Lavidge selected "Prism" for his control group which shared the characteristic with the tested products of not displaying the maker's name anywhere on the front label and like FINISH 2001 was a relatively new product in the market.)

Dr. Lavidge also criticized Dr. Whitcup for testing for reverse confusion. The proper procedure is to show the senior product (NU FINISH) and ask the consumer to chose another product made by the same manufacturer. Dr. Whitcup did the reverse—showing FINISH 2001 and asking the interviewee to choose other products by the makers of FINISH 2001. While we are unable to quantify what precise difference this made, the procedure causes us to lose confidence in the conclusions of Dr. Whitcup's study. The whole theory of Plaintiff's confusion argument is that NU FINISH buyers mistakenly selected FINISH 2001. Yet its survey didn't really test for proof of that proposition. The particular order is important because the survey attempts to focus on what actually occurs in the marketplace. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1444 n. 82 (S.D.Ohio 1990).

We also believe that Dr. Lavidge was a more convincing witness. His extensive work with marketing surveys for the business community, together with his inclusion of questioning those who experienced confusion, lead us to accept Dr. Lavidge's testimony and reject that of Dr. Whitcup, whose background is predominantly academic.

■ Reed Union also contends that its significant loss of sales after the introduction of FINISH 2001 also demonstrates confusion. The crux of the argument is that the car polish market is stagnant, and FINISH 2001's dramatic growth came at a time when NU FINISH sales declined. While this argument has a superficial appeal, it does not survive in the face of the evidence. At the time of FINISH 2001's climb in the market (1990–1991) several things were occurring. First, colored waxes had been introduced and immediately became popular. Although these new products expanded the car polish market to some extent, we also find these new products were responsible for some of the loss in sales by NU FINISH. Secondly,

Reed Union got into an argument with one of its retailers (Pep Boys—a large chain of automobile aftercare products) and NU FINISH was removed from Pep Boys shelves for the 1991 selling season. At the same time, Turtle Wax, which had long been conscious of relationships with the retailers (and had spent millions to improve them), launched several campaigns with the mass retailers to secure more shelf space and end caps. (End caps are free-standing displays at the end of counters which display only one product, often at a sales price). End caps attract buyers who otherwise might not be coming to the store with the express purpose of purchasing such a product. Those efforts were successful and FINISH 2001 sales at K–Mart mushroomed. NU FINISH did not cultivate retailer relationships and more importantly did not pay the additional premiums for end caps displays. Turtle Wax also stepped up its allowances to the retailers for co-op advertising. NU FINISH devoted little to such advertising. When we examine the Defendant's exhibits showing sales of NU FINISH and FINISH 2001 at the thirteen largest retailers (accounting for over fifty percent of all the sales of both products), we find no common thread tying NU FINISH's lost sales to FINISH 2001's gains. We are convinced that NU FINISH's decline in sales after FINISH 2001's introduction cannot be traced to confusion among consumers seeking to buy NU FINISH and winding up with FINISH 2001. Thus, at the end of this analysis we do not find the existence of actual confusion causing NU FINISH customers to purchase FINISH 2001, believing they are buying a NU FINISH or Reed Union product. It is proper to infer from the absence of any credible evidence of actual confusion that there is no likelihood of confusion. *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 884 (N.D.Ill.1992); *Hanig & Co. v. Fisher*, 1994 WL 97758.

## VI. *Turtle Wax's Intent to Palm Off Its Product As That of Reed Union*

■ Evidence of wrongful intent is not required to establish likelihood of confusion, *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th

Cir.1983) but when it exists, it is an important factor in the likelihood-of-confusion analysis. *Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1070 (7th Cir.1992). Further, intent can be inferred when the defendant, with knowledge of plaintiff's trade dress, adopts a similar trade dress. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 937–38 (7th Cir.1989).

■ Here, several facts are clear. Turtle Wax designers and marketing people knew of the NU FINISH mark and trade dress. In 1989 and even before they studied NU FINISH's new-found success, Turtle Wax had decided to fight NU FINISH's success. After the failure of Turtle Wax Super Hard Shell Finish to cut into the NU FINISH market share, Turtle Wax decided to create a new brand designed to win back what was directly affecting its market share. So far so good. Knowledge of another's product and an intent to compete with it is not equivalent to an intent to mislead the consumer. *Henri's Food Prod. Co. v. Kraft, Inc.*, 717 F.2d 352 (7th Cir.1983).

When Turtle Wax set about the business of designing a new product it considered a myriad of names. The evidence shows there was no effort to copy NU FINISH's name. The final name was chosen because, like the word FINISH in NU FINISH, it described the product. After working with its advertising firm it came up with the number 2001, perhaps drawn from the motion picture *2001, A Space Odyssey*. Turtle Wax's interest as testified to by several of its witnesses was to create a product that appeared futuristic. To that end it chose the futuristic fluorescent green bottle with a modern shape. We credit that testimony and find no intent to copy or palm off its product by copying or using the NU FINISH name or mark.

■ The most difficult question comes from Turtle Wax's selection of a fluorescent orange-red label with black lettering and a list of claims. Why did Turtle Wax's marketing vice president select orange-red and black on a brand that was designed to compete with a product with an orange and black trade dress? Was it just another effort to create a futuristic appearing product? If so, there are other colors that surely could do just as well. Mr. Cusack denied an intent to copy. Apparently no one at Turtle Wax discussed the possibility of confusion when the color scheme was selected and the label was designed. Yet, Turtle Wax designed the product to compete with NU FINISH, which used the color scheme.

We have carefully weighed the credibility of the Turtle Wax executives most of whom were called by Reed Union. We reviewed the myriad of documents pertaining to the creation of FINISH 2001. Turtle Wax had already selected a fluorescent green bottle, larger and quite different from that used by NU FINISH. The label included several entries absent from NU FINISH, such as "Urethane Enriched Formula" prominently displayed, and a graph at the bottom with a chartreuse insert. Although the intent of Turtle Wax's employees and agents, like other issues in this case, is close, we conclude that Turtle Wax did not intend to copy or palm off. Rather, it intended to come close without stepping over the line. We conclude it did so, although just barely. Thus, while there was no bad faith by Turtle Wax, its intent to come close is probative on the likelihood of confusion issue. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966 (11th Cir.1983).

### So Is There a Likelihood of Confusion?

■ Turtle Wax's FINISH 2001 and Reed Union's NU FINISH are the same product—car polish. They are both market leaders and compete for the same consumers in the same stores, often on the same shelf. The marks and trade dress have far more differences than similarities, but there are two important similarities (orange and black labels and the word "FINISH"). Consumers exercise some modest care in selecting these low-priced car polishes. There is no credible evidence of actual confusion, but Turtle Wax did go to the very edge of what the law allows in designing its trade dress. Thus, four factors (similarity of product, area of competition, a weak mark and dress with a secondary meaning, and only modest care by the consumer) favor Reed–Union. Two factors (no actual confusion and no intent to palm off) favor Turtle Wax. One remaining

factor (similarity of name and dress) tend to favor Turtle Wax slightly.

Three of these factors in the likelihood of confusion analysis are generally considered the most important—the intent of the alleged infringer, evidence of actual confusion, and similarity of trade dress. *Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 816 (N.D.Ill.1990), *citing Ziebart Int'l Corp. v. After Market Assoc., Inc.*, 802 F.2d 220, 226 (7th Cir.1986). In these areas Turtle Wax clearly has the better of the argument. The trade dress and marks have more differences than similarities, and the overall futuristic presentation of FINISH 2001 is markedly different from the drab orange and black dress of the NU FINISH package (which has been unchanged for fifteen years). The Court is unable to credit any of the testimony (expert or otherwise) purportedly showing actual confusion. Turtle Wax was not in our view trying to steal Reed Union's customers by marketing a confusingly similar product. As articulated by the Seventh Circuit, "the weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." *AHP Subsidiary Holding Corp. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993). The case is a close one. Recognizing as we must that any doubt on the issue of confusion should be resolved against Turtle Wax (*McGraw Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1172–73 (7th Cir.1986)), we nevertheless conclude there is no doubt. Reed Union has failed to prove by a preponderance of the evidence that there is a likelihood of confusion between its NU FINISH and Turtle Wax's FINISH 2001.

Accordingly, judgment is entered in favor of Defendant Turtle Wax and against Plaintiff Reed Union on all remaining charges contained in the Complaint.

This a final and appealable order under Fed.R.Civ.P. 54(b).

1. On November 30, 1993, we granted summary judgment in favor of Turtle Wax on a limited

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

On November 14, 1994, we entered judgment in favor of Turtle Wax and against Reed–Union on all claims remaining in the complaint.[1] Reed–Union, in its motion to alter or amend under Fed.R.Civ.P. 59(e), points out that we have not clearly dealt with three of Turtle Wax's counterclaims. We do so now.

Turtle Wax's first counterclaim seeks cancellation of U.S. Supplemental Trademark Registration No. 1,061,450 for "once a year car polish" on the grounds that the mark is generic. We agree. As discussed in the original opinion, the mark is not entitled to protection because the phrase defines a "central characteristic of car waxes in general." *Reed–Union Corp. v. Turtle Wax, Inc.*, 869 F.Supp. 1304, 1308 (N.D.Ill.1994). The evidence at trial demonstrated that the once-a-year car polish or wax has been used by Turtle Wax and other competitors for many years prior to Reed–Union's registration. Reed–Union argues that Turtle Wax was required to prove that the term is a commonly recognized name among consumers for a kind or genus of product. This assertion is really irrelevant to the question of whether the mark is generic, but in any event, we find sufficient evidence of common usage of this term in the industry to overcome Reed–Union's objection. Judgment is entered in favor of Turtle Wax on its first counterclaim, and the commissioner of Patents and Trademarks is ordered to cancel Registration No. 1,061,-450 pursuant to 15 U.S.C. § 1119.

For the reasons already discussed in the Court's original memorandum opinion and order, the mark "NU FINISH" is entered for Reed–Union and against Turtle Wax on the second counterclaim.

Turtle Wax's third counterclaim alleges copyright misuse—use of Reed–Union's registration of a "junkyard" commercial to restrain Turtle Wax's use of a similar commercial—was, we believe, decided in the decision granting summary judgment on this claim.

number of claims of Reed–Union.

Accordingly, judgment is entered on Turtle Wax's third counterclaim in favor of Turtle Wax, and Reed–Union's copyright registrations on this junkyard commercial are declared unenforceable against Turtle Wax.