SYNDICATE SALES,
INCORPORATED, Plaintiff–Appellant,

v.

HAMPSHIRE PAPER
CORPORATION, Defendant–Appellee.

No. 98–4217.

United States Court of Appeals,
Seventh Circuit.

Argued April 23, 1999.

Decided Sept. 13, 1999.

Dwight D. Lueck (argued), Barnes & Thornburg, Indianapolis, IN, for plaintiff-appellant.

Brian K. Burke, Baker & Daniels, Indianapolis, IN, Douglas G. Verge (argued), Sheehan, Phinney, Bass & Green, Manchester, NH, for defendant-appellee.

Before BAUER, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Syndicate Sales brought this action against Hampshire Paper Corporation ("Hampshire Paper"), alleging trade dress infringement under the Lanham Act, trade dress dilution under the Federal Trademark Dilution Act, and related state law claims for unfair competition and interference with business relations. The district court granted summary judgment to Hampshire Paper. Syndicate Sales appeals. For the reasons stated in this opin-

ion, we affirm in part and reverse in part the judgment of the district court.

# I

## BACKGROUND

Syndicate Sales produces plastic baskets used for floral bouquets at funerals. In 1960, it began offering its "# 92" basket. Since that time, it has sold approximately 50 million such baskets. Around the same time, Syndicate Sales also offered its "# 95" basket; it has sold about 10 million of these baskets. Syndicate Sales has advertised its baskets through catalogs, flyers, brochures and trade shows.

Hampshire Paper, which was originally a floral paper products company, decided to enter the plastic products market in 1994. It used the Syndicate Sales funeral baskets as a model for its baskets. One of Hampshire Paper's baskets, the "# 9200," is similar to Syndicate Sales' # 92 basket. The two baskets' teardrop-shaped handles, round buckets and bases with triangle supports are very similar. The lattice work on the handles also appears somewhat similar. However, the lattice work of Syndicate Sales' handles generally takes an oval shape, while the Hampshire Paper lattice work takes the shape of interlocking semicircles and triangles. Hampshire Paper sells the baskets in boxes of two dozen, just as Syndicate Sales sells its baskets in boxes of two dozen.

Hampshire Paper also produced a "# 9500" basket that is similar to Syndicate Sales' "# 95" basket. The general flute shape of the baskets, along with the shape of the bases and handles, are similar. However, the lattice work on the handles is not identical. The two types of baskets are each sold in boxes of 18.

Hampshire Paper has also begun plans for a "# 9100" basket, which will be similar to Syndicate Sales' "# 91" basket.

Both companies sell their baskets to wholesalers, who then sell the baskets— still contained in their original boxes—to retailers. Hampshire Paper ships its baskets to wholesalers in brown boxes with Hampshire Paper's name displayed prominently on the box; Syndicate Sales sells its baskets in white boxes with green lettering. Its name is also displayed on its boxes.

Syndicate Sales makes several claims against Hampshire Paper. It alleges that Hampshire Paper has copied its trade dress in violation of sec. 43(a) of the Lanham Act, 15 U.S.C. sec. 1125(a), and the Indiana common law against unfair competition. The district court rejected these claims because it thought that there was no likelihood of confusion as to the source of the baskets. Syndicate Sales also alleges that Hampshire Paper is trading on Syndicate Sales' reputation, thereby diluting its allegedly famous trade . dress, in violation of the Federal Trademark Dilution Act, 15 U.S.C. sec. 1125(c) & 1127. The district court rejected this claim by holding that the trade dress was not famous. The district court also rejected Syndicate Sales' claim of interference with business relations because there was no underlying illegal act by Hampshire Paper.

# II

## DISCUSSION

### A. Trade Dress

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] which prohibits in-

1. Section 43(a) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of

fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her

fringement of trademarks, also protects trade dress. " 'Trade dress' refers to the total image of a product, including features such as 'size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124 (1990). In this case, Syndicate Sales seeks protection of the configuration of its baskets, which is a form of trade dress.

This court has previously explained how a plaintiff may establish a trade dress claim under § 43(a) of the Lanham Act:

> In order to prevail on a claim of trade dress infringement, a plaintiff must show that 1) its trade dress is either inherently distinctive or has acquired secondary meaning, and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products.

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998).

■ We shall focus here on the second of these criteria—the likelihood of confusion regarding the source of the baskets. Our prior case law provides guidance on this issue:

> A number of factors must be examined when determining if a likelihood of confusion exists between the trade dresses of two products. These include: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plain-

tiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff.... [N]one of these factors considered alone is dispositive, and the weight to be accorded each varies from case to case. When making its inquiry, the court must compare the trade dresses "in light of what happens in the marketplace, not merely by looking at the two ... side-by-side."

*Id.* at 296 (quoting *Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir.1997)) (citations omitted). Customers who do not care about the source of goods are not considered in the determination whether there is a likelihood of confusion. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5, at 23–16 to 23–17 (1999).

■ Syndicate Sales admits that wholesalers would not be confused as to the source of the boxes of baskets they receive. It contends, however, that retailers would be confused, and that the district court improperly limited its consideration to the wholesale market.[2] However, the district court did consider the possibility of retailer confusion. It stated that retailers merely order funeral baskets generically, so that any confusion they have as to source is irrelevant because they are indifferent to the source of the baskets. The district court also noted that confusion is unlikely because the Syndicate Sales baskets and the Hampshire Paper baskets are shipped in distinct boxes (Syndicate Sales' are colored white with green lettering; Hampshire Paper's are colored brown). Moreover, the name of each company is placed prominently on its boxes.

goods, services, or commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

**2.** Significantly, Syndicate Sales does not base its argument on confusion by the actual consumers of the baskets.

Syndicate Sales does provide limited evidence that some retailers do care about the source of the baskets. However, for those retailers that do care, we believe that the district court correctly held that the packaging differences provide strong evidence against a finding of likelihood of confusion. This and other circuits have considered distinct labeling and packaging as significant factors in determining whether there is a likelihood of confusion. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 383 (7th Cir.1996); *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir.1995), *cert. denied*, 517 U.S. 1234, 116 S.Ct. 1878, 135 L.Ed.2d 173 (1996).[3] The Third Circuit, noting that the various confusion factors may be accorded varying weight, explained:

> In a product configuration trade dress infringement, ... consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations. Thus, in trade dress infringement suits where the dress inheres in a product configuration, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements. "The most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the

container, package, wrapper, or label of the manufacturer's or trader's name ... [and when] that is done, there is no basis for a charge of unfair competition." *Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir.1963).

*Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir.1995); *see also Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 259 (5th Cir.1997).

There are, of course, situations where distinct labeling or packaging of products will not prevent confusion. For example, when little care should be expected by the relevant purchaser, or when the differences in labeling and packaging are not great, then perhaps distinct labeling and packaging will be insufficient. Indeed, in *Thomas & Betts*, 138 F.3d at 297, we rejected a similar argument because there was evidence that distributors repackaged the product before consumers purchased them. Such a consideration is not relevant to this case; we are not considering confusion among consumers who will never see the packaging and labeling. Instead, we are considering confusion among retailers, who receive the baskets in clearly labeled packages. Moreover, as we have indicated, the only retailers relevant to our determination are the ones that actually care about the source of the baskets. Such retailers, who receive the baskets in the regular course of business, may be charged with the minimal ordinary care that it would take to distinguish the clearly marked Syndicate Sales and Hampshire Paper packages. On the facts of this case, therefore, we think that the distinctive labeling and packaging is a strong indication that there is no likelihood of confusion.

---

**3.** *See also Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1328 (Fed.Cir.1999); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir.1999); *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 259 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1512 (2d Cir.1997); *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189,

203 (3d Cir.1995), *cert. denied*, 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Bristol–Myers Squibb Co. v. McNeil–P.P.C.*, 973 F.2d 1033, 1045–46 (2d Cir.1992); *Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981); *cf. Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 114–15, 59 S.Ct. 109, 83 L.Ed. 73 (1938) (unfair competition claim).

■ Syndicate Sales contends that post-sale inspection of the labeling and packaging cannot cure initial confusion. It notes that retailers will see the packaging only after shipment of the baskets. We agree that initial confusion may, in certain cases, be sufficient for a finding of likelihood of confusion even if the confusion is later dispelled. In *Dorr–Oliver*, 94 F.3d at 382, we noted that the Lanham Act forbids a competitor from luring potential customers away from a producer by passing goods off as those of the producer, even when confusion as to the source of the goods is dispelled by the time the sale is consummated. Such "bait and switch," also known as "initial interest" confusion, will affect the buying decisions of the consumers when it permits the competitor to "get its foot in the door" by confusing the consumers. When post-sale inspection of the goods is an ineffective remedy, such an approach makes sense. See *Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256 (9th Cir.1986) (holding that telephone sales calls to consumers of the goods constituted actionable confusion when the nature of the item purchased made careful post-sale inspection unlikely and there was no other evidence that post-sale inspection was likely to be adequate). Here, however, retailers—more specifically, those retailers who actually care about the source of the baskets—are in a better position than the typical consumer either to order the correct goods, or to return the incorrect goods and receive the intended goods. See, e.g., *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir.1983) (rejecting a temporary confusion claim because the purchasers were sophisticated). Indeed, an affidavit submitted by a Syndicate Sales witness indicates that many retailers did, upon inspection, send back the baskets that they did not want. For the limited number of retailers that care about the source of the baskets, post-sale inspection is sufficient.

Syndicate Sales submits that other likelihood-of-confusion factors weigh against the district court's determination. It stresses that the baskets' appearances are similar, that the baskets are used in the same markets, that there is evidence of actual confusion and that Hampshire Paper intended to copy Syndicate Sales' baskets. Nevertheless, as we have indicated earlier, the trade dress of a product must be considered in light of its packaging. In our view, when the overall trade dress of the product is viewed from the perspective of the retailers, the labeling and packaging of the baskets is far more important than the similarities in the appearance of the baskets. Confusion is unlikely. Although Hampshire Paper may have intended to make its baskets look similar to Syndicate Sales' baskets, its packaging of the baskets in different colored packaging, with its name on the package, made the possibility of actual retailer confusion minimal.

Notably, against this evidence of no likelihood of confusion, the record contains only minimal evidence of actual confusion. Syndicate Sales relies upon only two affidavits from retailers indicating that they did not immediately recognize the difference between the Syndicate Sales and Hampshire Paper baskets. Moreover, these retailers also indicated that they eventually were able to distinguish the baskets—either based on the boxes in which they were shipped or differences in the baskets' appearance. This minimal evidence does not create a material issue of fact when considered in light of other indications that there is no likelihood of confusion, especially since retailers who care about the source of baskets can be charged with the minimal care it would take to distinguish the labeling and packaging.[4]

---

**4.** On appeal, Syndicate Sales explicitly links its state claim for unfair competition to its federal claim for trade dress infringement. It notes that Indiana law, which applies to its claim, looks to the same set of facts as the federal claim. Because we reject Syndicate Sales' federal claim, we also reject its state claim.

## B. Dilution

■ Syndicate Sales also makes a claim under the Federal Trademark Dilution Act of 1995 ("the FTDA"), 15 U.S.C. §§ 1125(c) & 1127, which amended § 43 of the Lanham Act. Section 43(c) states, in part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c). To prove a dilution claim, a plaintiff must provide sufficient evidence that (1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce. *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 452 (4th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 286, —— L.Ed.2d —— (1999); *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 45–50 (1st Cir.1998); *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir.1998). The statute provides:

> The term "dilution" means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—
>
> > (1) competition between the owner of the famous mark and other parties, or
> >
> > (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127.

The statute also contains a nonexclusive list of factors relevant to the determination of whether a mark is famous:

> (A) the degree of inherent or acquired distinctiveness of the mark;
>
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (C) the duration and extent of advertising and publicity of the mark;
>
> (D) the geographical extent of the trading area in which the mark is used;
>
> (E) the channels of trade for the goods or services with which the mark is used;
>
> (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
>
> (G) the nature and extent of use of the same or similar marks by third parties; and
>
> (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c).

■ On appeal, Hampshire Paper mounts a very sketchy challenge to the constitutionality of the FTDA as applied to product configuration cases. It also appears to suggest that the statute was not intended to apply to trade dress cases at all. The constitutional argument, set forth so superficially that we can make out only its principal contours, is nevertheless not an insubstantial one. *See I.P. Lund*, 163 F.3d at 51 (Boudin, J., concurring). Nor, given the difference in wording between § 43(a) and § 43(c), can we say that the contention that the statute is inapplicable to trade dress is totally without merit. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). ("It would be a different matter if there were textual basis in sec. 43(a) for treating inherently distinctive verbal or symbolic trademarks differently from inherently distinctive trade dress."). However, neither the constitutional nor the statutory argument was made before

the district court. Neither the district court nor Syndicate Sales had an opportunity to address the matter in the court's consideration of the summary judgment motion, and, before this court, Syndicate Sales has had only the limited opportunity offered by the reply brief to address the vague contours that Hampshire sets out in its brief. Under these circumstances, we conclude that Hampshire Paper has waived the opportunity to have the matter resolved in this appeal from the grant of summary judgment in its favor. *See Wildey v. Springs*, 47 F.3d 1475, 1480 n. 8 (7th Cir.1995).

■ The district court addressed the issue whether Syndicate Sales' trade dress meets the statutory criteria of being "famous." Finding that the trade dress is famous, if at all, only among wholesalers and retail florists, the court held that fame in such a niche market cannot be sufficient to establish fame for purposes of the FTDA. Before us, Syndicate Sales now disputes the district court's conclusion that fame in a niche market is always insufficient to fulfill the statutory criteria.

■ At an initial glance, there appears to be a wide variation of authority on this issue. Some cases apparently hold that fame in a niche market is insufficient for a federal dilution claim, while some hold that such fame is sufficient. However, a closer look indicates that the different lines of authority are addressing two different contexts. Cases holding that niche-market fame is insufficient generally address the context in which the plaintiff and defendant are using the mark in separate markets.[5] On the other hand, cases stating that niche-market renown is a factor indicating fame address a context like the one here, in which the plaintiff and defendant are using the mark in the same or related markets.[6] The validity of this distinction is supported by the Restatement and a commentator:

> A mark that is highly distinctive only to a select class or group of purchasers may be protected from diluting uses directed at that particular class or group. For example, a mark may be highly distinctive among purchasers of a specific type of product. In such circumstances, protection against a dilution of the mark's distinctiveness is ordinarily appropriate only against uses specifically directed at that particular class of purchasers; uses of the mark in broader markets, although they may produce an incidental diluting effect in the protected market, are not normally actionable.

Restatement (Third) of Unfair Competition § 25 cmt. e (1995); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:112, at 24–204 to 24–205 (1999).

---

**5.** *See Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F.Supp. 1454, 1463 (S.D.Fla.), *aff'd*, 166 F.3d 353 (11th Cir.1998); *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F.Supp. 742, 749 (N.D.Ga.1996); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F.Supp. 568, 578 (D.Colo.1997), *aff'd*, 185 F.3d 1084 (10th Cir. 1999); *cf. Mead Data Central, Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989) (interpreting the New York anti-dilution statute).

We express no opinion as to the validity of this line of cases. We merely note that they do not address the issue in this case, in which the plaintiff and defendant are operating in the same market.

**6.** *See Teletech Customer Care Management, Inc. v. Tele–Tech Co.*, 977 F.Supp. 1407, 1413

(C.D.Cal.1997); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 955 F.Supp. 605, 617 (E.D.Va. 1997), *aff'd*, 170 F.3d 449 (4th Cir.1999); *Star Markets, Ltd. v. Texaco, Inc.*, 950 F.Supp. 1030, 1035 (D.Haw.1996); *see generally Washington Speakers Bureau, Inc. v. Leading Auths., Inc.*, 33 F.Supp.2d 488, 503–04 & n. 31 (E.D.Va.1999).

Hampshire Paper's suggestion that the FTDA does not protect marks from use by competitors is contrary to the plain language of the statute: "The term 'dilution' means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties...." 15 U.S.C. § 1127.

██ Moreover, one of the factors in § 1125(c) for determining the existence of fame indicates that fame may be constricted to a particular market. That factor is "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought." 15 U.S.C. § 1125(c)(1)(F). We acknowledge, of course, that the narrowness of the market in which a plaintiff's mark has fame is a factor that must be considered in the balance. This is the approach taken by the First Circuit. *See I.P. Lund*, 163 F.3d at 47 (considering the lack of strength of the mark, the lack of survey evidence, the lack of nationwide recognition, and, finally, the narrowness of the market, in concluding that the mark was not sufficiently famous). However, when the defendant allegedly uses a mark in the same market as the plaintiff, the narrowness of that market is less important. We therefore hold that the district court erred in concluding that the trade dress was not famous based solely on the niche-market status of the baskets.[7] Although the text of the district court's order is open to some ambiguity, it does not appear that the court determined, in the alternative, that Syndicate Sales' trade dress was not "famous" within the more limited market that we now have held to be within the ambit of the statute. Clearly, the court did not consider, in this context, all of the factors set forth in the statute. Therefore, on remand, the district court should consider whether, in the market as we have defined it in this case, Syndicates Sales' trade dress is sufficiently famous.

## C. Interference with Business Relations

██ Syndicate Sales alleges that Hampshire Paper's actions constitute interference with business relations under Indiana law. The Indiana Court of Appeals has explained the elements necessary for such a claim:

The elements of an action for tortious interference with a contract are (1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach.

In addition it has been recognized that an action may lie under Indiana law for tortious interference with a business relationship even though there was no valid contract. In such cases, however, it appears to be critical that the defendant acted illegally in achieving his end.

*Biggs v. Marsh*, 446 N.E.2d 977, 983 (Ind. Ct.App.1983).

██ The district court dismissed the interference with business relations claim on the ground that Syndicate Sales, which apparently did not have contracts with its purchasers, had not proven the required illegal action. Syndicate Sales contends that the dilution claim, which we are remanding to the district court, may serve as the required illegal act for the interference with business relations claim. Hampshire Paper responds that only criminal acts may serve as such predicate acts under Indiana law. Hampshire Paper does not cite a single Indiana case indicating that the predicate illegal act must be criminal. Moreover, courts interpreting Indiana law have held that non-criminal illegal acts are sufficient. *See United States v. FKW Inc.*, 997 F.Supp. 1143, 1153 (S.D.Ind.1998); *Moffett v. Gene B. Glick Co., Inc.*, 604 F.Supp. 229, 239 (N.D.Ind.1984), *overruled*

---

7. We do not mean to imply that the market may be limited geographically to a single local area. The legislative history of the statute makes clear that Congress intended that, in order to be "famous," a mark must be used in a substantial segment of the United States.

*See* H. Rep. No. 104–374 (1995), 1996 U.S.C.C.A.N. 1029, 1034. However, within that segment, its "fame" may be limited to those engaged on a regular basis in commercial activity involving this product.

*on other grounds, Reeder–Baker v. Lincoln Nat'l Corp.,* 644 F.Supp. 983 (1986). We therefore cannot accept Hampshire Paper's argument. This claim must be remanded as well.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed and remanded in part. Each party shall bear its costs in this appeal.

AFFIRMED in part and REVERSED and REMANDED in part