**BRETFORD MANUFACTURING, INC., Plaintiff**

v.

**SMITH SYSTEM MANUFACTURING COMPANY Defendant.**

No. 98 C 0287.

United States District Court, N.D. Illinois, Eastern Division.

June 23, 2000.

Bart Allen Lazar, Michael Dale Wexler, Charles Chejfec, Seyfarth Shaw, Chicago, IL, Eric W. Gallender, Brinks, Hofer, Gilson & Lione, Chicago, IL, for plaintiffs.

Brett A. August, Bradley Louis Cohn, Kathryn Elizabeth Ross, Victor Sapphire, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Chicago, IL, for defendant.

### MEMORANDUM OPINION

GRADY, District Judge.

Before the court are cross-motions for summary judgment. For the following reasons, defendant's motion is granted and plaintiff's motion is denied.

### BACKGROUND

Plaintiff Bretford Manufacturing, Inc., ("Bretford") is an Illinois corporation that, among other things, manufactures desks, work stations, tables, and other furniture.

Since 1990, Bretford has been engaged in the production, advertising, and sale of the CONNECTIONS series computer furniture for office, school, and institutional use. The CONNECTIONS series has been sold exclusively under the trade name and mark BRETFORD®. The CONNECTIONS series computer work table features a three-quarter inch thick tabletop and legs that connect to the tabletop in the form of a "V". The V-shape of the Bretford CONNECTIONS series work table legs is the subject of the instant law suit.

Defendant Smith System Manufacturing Company ("Smith"), a Delaware corporation, also manufactures desks, work stations, tables and other furniture. In 1996, Smith developed the FLEXLINE series of computer work tables, using the leg design of Bretford's CONNECTIONS table as a basis for developing its FLEXLINE tables. While the FLEXLINE table is quite similar to the CONNECTIONS table, the FLEXLINE table has a slightly thicker top and thicker molding. Further, FLEXLINE tables currently have labels with the Smith logo affixed to the modesty panel, though the tables were not so labeled initially.[1]

Bretford was the only manufacturer to make a computer table with a V-shaped leg from 1990 until 1997. Bretford claims that as the exclusive manufacturer of computer tables featuring the V-shaped leg, it aggressively marketed the design, spending over $4,000,000 on advertising and promotional materials focused on the leg. Smith admits that it modeled its line after Bretford's to better compete with Bretford in the institutional user market. Both parties, as well as several dealers, are in agreement that uniformity is important to end-users such as schools when purchasing decisions are made. Smith states that it copied the Bretford design, in part, to appeal to consumers seeking to purchase new computer desks to match the ones already in their schools. Smith disputes that Bretford aggressively marketed the V-design because Bretford only provides two examples of promotional literature where the V-design is mentioned. *See* Plaintiff's Appendix, at Tab 3.

### How Computer Work Tables Reach End–Users [2]

Both companies sell computer tables to schools and other institutional end-users, largely through dealers, distributors, and wholesalers (collectively, "dealers").[3] Dealers use catalogs provided by manufacturers or their own catalogs, which include inserts paid for by the manufacturers, to present to customers and institutional users the products they sell. "Catalog Allowances," or the payment to dealers of money in exchange for space in their cata-

1. Smith alleges that it began labeling its tables pursuant to our suggestion at the Rule 16 Conference in this case on July 21, 1998. Smith states that it started to use three-inch by one-inch labels in early autumn 1998, later replacing the labels with larger seven-and-one-half-inch by two-inch labels. In September of 1999 attorneys for Bretford ordered a FLEXLINE table. The table they received in November of 1999 bore the smaller label. Smith states that Bretford merely received older inventory. In November of 1999, Bretford's private investigator found some Smith tables in schools without labels, and others with the smaller labels. However, this appears to be consistent with Smith's statement as to when it began labeling and then changed the size of the labels.

2. Bretford initially objected to this description of the bidding process, primarily set forth in five declarations from dealers provided by defendant, because the declarants were not disclosed to plaintiff. *See* Plaintiff's Motion to Strike, at 6. We gave Bretford leave to depose the declarants and to file a brief with respect to the issues raised by the depositions. *See* Order of March 28, 2000. On May 30, 2000 Bretford filed a brief raising objections to the declarants' opinions with respect to potential consumer confusion. However, nothing in the brief or in deposition transcripts is at odds factually with the process described here. *See* Bretford's Brief on How The Deposition Testimony of Smith's Undisclosed Affiants Supports Bretford's Motion For Summary Judgment ("Plaintiff's Deposition Testimony Brief"), at 11–12.

3. Bretford states that approximately 30% of its sales are through catalogs and the remaining 70% through dealers. *See* Plaintiff's Appendix, Tab 10 ¶ 9.

logs, are among manufacturers' largest annual promotional expenditures. Smith states that its merchandise never appears in a catalog where it is not featured on a dedicated page, prominently featuring its company name and trademarks as well as pictures of the product being sold. Bretford does not dispute Smith's statement, but claims that manufacturers do not have control over the advertisements created by dealers. Bretford's CONNECTIONS table has appeared in dealer catalogs without the Bretford or CONNECTIONS marks or logos.

In a typical sales transaction, an end-user, such as a school, first formulates a bid specification, setting forth the requirements of the equipment the end user seeks to purchase. This is typically done with the assistance of a dealer or manufacturer's sales representative, using the manufacturer's specification sheet, catalogs and promotional materials as a guide.[4] In the educational furniture market, dealers make suggestions as to the language of the bid request. A bid may specifically identify a manufacturer, or it may simply describe a particular item. Bid requests regularly specify that "equivalents" may be bid.

Once the end-user completes its bid specification it typically sends the specification out to several dealers. The dealers contact manufacturers, like Bretford or Smith, and the manufacturers quote prices to the dealers. The dealers determine their mark-up on each item, then complete and submit the bid sheet to the end-user. Bid sheets typically disclose the name of the manufacturer and the model number of the furniture.[5] When a bid is successful, a purchase order issues from the end-user to the successful dealer, usually specifying the manufacturer and model numbers of the products being purchased. The manufacturer's name and model are repeated in the invoice and shipping list sent to the end-user.

When a purchaser orders either Bretford's or Smith's furniture, the furniture is delivered in boxes that display the name of the manufacturer. Bretford marks its computer table shipping containers with a label approximately 12 inches long and four inches high. The label states Bretford's name, the model number of the contents, and a brief description of the product. In addition to the computer table, the shipping container contains an assembly instruction sheet with the BRETFORD name on it. Likewise, Smith ships its FLEXLINE tables in boxes prominently featuring a 12 inch by three inch SMITH SYSTEM company name and logo, and a packing list attached to the box contains in its heading the SMITH SYSTEM company name, address, and telephone and fax numbers, as well as a description of the contents.

### Events Precipitating This Lawsuit

In late 1996 or early 1997, the Dallas, Texas Independent School District issued a request for proposals to supply 300 computer work centers. The bid request specified Bretford tables as the reference product but allowed that substitutes could be bid. Various dealers bid on the contract, providing the school district with samples. In April, 1997 the Dallas Independent School District awarded the contract to J & S Equipment, a Texas dealer, which agreed to provide Smith FLEXLINE computer tables to meet the specifications.

### The Pending Actions

In January, 1998 Bretford filed this suit alleging that Smith had engaged in trade dress infringement, unfair competition/false advertising, and reverse passing off in violation of Section 43(a) of the United States Trademark Act of 1946, 15 U.S.C. § 1125(a) and under the common

---

4. Bretford points out that the contact in the transaction for the end-user may or may not be the person who makes the final purchasing decision. *See* Plaintiff's Deposition Testimony Brief, at 12.

5. Plaintiff disputes this fact with the deposition of Frank Kemner, a dealer in both Smith and Bretford products, who states that he does not provide information regarding the brand of product he uses to fulfill a bid request unless the customer asks for it.

law. The complaint also alleged unfair and deceptive business practices and deceptive trade practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1–12, as well as similar claims under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com.Code § 17.46–.50 and the Washington Consumer Practices Act, RCW § 19.100.190.

We determined at a Rule 16 conference on July 21, 1998 that "there is a very substantial issue as to likelihood of confusion," at least with respect to the trade dress infringement claims. After a year of discovery, the parties filed the cross-motions for summary judgment on the issue of likelihood of confusion that are before us now.

### DISCUSSION

 To establish trade dress infringement, a plaintiff must demonstrate that "1) its trade dress is inherently distinctive or has acquired secondary meaning, and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of customers as to the source or affiliation of the products." *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir.1999) (citing *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191, (1996)).[6] The Seventh Circuit examines the following factors when determining whether likelihood of confusion exists between competing trade dresses:

1) the similarity of the trade dresses;
2) the area and manner of concurrent use;
3) the degree of care likely to be used by consumers;
4) the strength of the plaintiff's trade dress;
5) instances of actual confusion.
6) intent of the defendant to pass off its product as that of plaintiff;

[N]one of these factors considered alone is dispositive, and the weight to be accorded each varies from case to case. When making its inquiry, the court must compare the trade dresses in "light of what happens in the marketplace, not merely by looking at the two ... side-by-side."

*Id.,* (citations omitted). We will examine each factor, beginning with the strength of plaintiff's trade dress.

### 1. The Strength of the Plaintiff's Trade Dress

 "The term 'strength' of a [trade dress] refers to its distinctiveness ... or, more precisely, its tendency to identify the goods sold as coming from a particular source." *Reed–Union Corp. v. Turtle Wax, Inc.,* 869 F.Supp. 1304, 1307 (N.D.Ill. 1994). When determining the strength of a trade dress, courts consider whether the

---

**6.** The Supreme Court recently held that when the trade dress at issue is a product design feature, as it is here, infringement requires a showing of secondary meaning to meet the first prong because "the fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests." *See Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, at ——, 120 S.Ct. 1339, at 1344 (2000). Defendant argues that *Samara* is dispositive because plaintiff fails to establish secondary meaning. *See* Defendant's Submission of Controlling New Authority, at 3. Plaintiff counters that the "undisputed evidence in this case overwhelmingly supports a finding of secondary meaning." *See* Plaintiff's Supplemental Brief on the Impact of *Wal–Mart Stores, Inc. v. Samara Bros. Inc.* and Newly Discovered Evidence ("Plaintiff's Supplemental Brief"), at 2.

While we tend to agree with defendant as to the impact of *Samara,* we will undertake a full likelihood of confusion analysis for three reasons: (1) the parties have already fully briefed the likelihood of confusion issue; (2) defendant's argument for summary judgment is stronger on likelihood of confusion than on secondary meaning because the Seventh Circuit's decision in *Syndicate Sales,* 192 F.3d 633, is on point with respect to similarity of trade dress; and (3) because the issues tend to overlap, we can evaluate the significance of *Samara* as it relates to plaintiff's ability to demonstrate that it has established strong trade dress.

trade dress is inherently distinctive or has acquired secondary meaning. *See Time, Inc. v. Petersen Publishing Co.*, 173 F.3d 113, 117 (2d Cir.1999). However, we limit our analysis of the strength of plaintiff's trade dress to a discussion of whether the V-shaped leg has acquired secondary meaning, pursuant to the Supreme Court's recent decision in *Samara. See* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182.

In *Samara,* plaintiff was a children's clothing designer and manufacturer which designed a line of clothing marketed exclusively at JC Penney's and other chain stores. Plaintiff sued Wal–Mart Stores, Inc. when Wal–Mart contracted with one of its suppliers, Judy–Philippine, Inc., to create "knock-offs" of the Samara garments. Wal–Mart had supplied photographs of the Samara garments to Judy–Phillipine, and the Court noted that the garments were "duly copied," with "only minor modifications." *Id.* at 1341. Samara brought an action for copyright infringement as to the elements of the design that were protected, and an unregistered trade dress infringement action under § 43(a) of the Lanham Act. The Court held that:

> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or appealing.

*Id.* at 1344. The Court acknowledged, however, that an infringement case could be made out for a product design feature if that feature had acquired secondary meaning. That is, if "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself," protection for the design feature may be required. *Id.* at 1343 (citations omitted). Secondary meaning may be established through continual and exclusive use, intentional copying, significant advertising expenses, substantial sales, and direct consumer testimony. *Spraying Sys. Co. v. Delavan Inc.*, 975 F.2d 387, 393 (7th Cir.1992).

Bretford argues that it is "undisputed that the 'V' design is unique in its field." Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment on Likelihood of Confusion, at 3 ("Plaintiff's Motion"). We disagree. While it is true that Bretford was the only manufacturer to make a computer table with V-shaped legs from 1990–1997, Bretford does not provide persuasive evidence that consumers recognized the V-shaped leg as indicative of origin. Having examined Bretford's promotional materials, we are not persuaded that the "unique V-shape" was featured prominently, but whether we subjectively make that connection is not as important as whether consumers ever connected the V-shaped leg to the Bretford or CONNECTIONS mark. Bretford does not provide a traditional survey of either dealers or representative institutional buyers.[7] Rather, Bretford points to bid specification sheets that request "V" shaped supports as "incontrovertible evidence" of

---

**7.** We do not mean to suggest that plaintiff could not establish secondary meaning without a consumer survey. Contrary to defendant's suggestion, plaintiff need not necessarily provide a consumer survey to establish inherent distinctiveness or secondary meaning. For example, in *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1264 (Fed. Cir.1995), plaintiff demonstrated secondary meaning through the testimony of its chairman and a design witness, but there the record contained evidence of wide press coverage, hailing the furniture that was the subject of the case as "novel" and "exclusive." The

WEATHEREND furniture in *Imagineering* actually won an interior design competition featured at the Cooper Hewitt Museum. In those circumstances, the Federal Circuit affirmed the jury's findings. *Id.; see also Reed–Union Corp. v. Turtle Wax, Inc.*, 869 F.Supp. 1304, 1309 (N.D.Ill.1994) (finding secondary meaning without a survey where product was "marketed over eighteen years, advertised extensively and finally became a leader in the car polish market."). Bretford's evidence, by contrast, does not provide a basis for a finding of secondary meaning or inherent distinctiveness.

secondary meaning. Plaintiff's Motion, at 9; Plaintiff's Appendix, at Tab 4. Given the nature of the bidding process, we are not persuaded that describing a product for a given bid evidences secondary meaning. Plaintiff offers no evidence that customers care whether they get computer tables with V-shaped legs from Bretford or whether they get a similar table from Smith.

### 2. The Similarity of the Trade Dresses

■ There is no dispute as to the similarity of the V-shaped legs of the CON-NECTIONS and FLEXLINE tables: Smith admits to copying Bretford's design. Our analysis of similarity of trade dress, however, is informed by the Seventh Circuit's particularly relevant decision in *Syndicate Sales,* 192 F.3d 633. In that case, plaintiff Syndicate Sales was a company that manufactured plastic baskets used for floral arrangements at funerals. Syndicate Sales began making plastic baskets in 1960, selling approximately 50 million baskets. In 1994, another manufacturer, Hampshire Paper products, entered the plastic basket market with a basket admittedly modeled on the Syndicate Sales basket. Both companies sold (and may still sell), their baskets to wholesalers, who sell the baskets to retailers. The baskets are transferred from manufacturer to wholesaler, then from wholesaler to retailer, in the same marked boxes. The Seventh Circuit affirmed the district court's ruling on summary judgment that there was no likelihood of confusion as to the source of the baskets, and, further that Syndicate Sales' trade dress was not famous. Syndicate Sales argued that while wholesalers would not be confused, retailers could be confused. The Seventh Circuit affirmed the finding of the district court that retailer confusion was irrelevant because retailers are generally indifferent to the source of the baskets. Further, the Court stated that because baskets are shipped in identifying boxes, the few retailers who do care about the source of the baskets have adequate notice. *Id.* at 637. The Court emphasized that:

> In a product configuration trade dress infringement, ... consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous.

*Id.* Thus it is clear that the allegedly infringing V-shaped leg cannot be considered in a vacuum, but rather must be considered in light of labeling as to the total product, as well as the packaging, trademarks and advertising associated with the product. Plaintiff has not presented evidence from which it could reasonably be found that the similar leg, when taken, as it must be, with the related promotional materials and packaging materials, in the context of an industry where the manufacturers primarily sell through dealers and a bidding process, would create a likelihood of confusion.

First, the names of the product line— CONNECTIONS and FLEXLINE—are not similar, nor are the manufacturer names—Smith and Bretford. Smith alleges that as a result of the discussion at the Rule 16 Conference it began to affix Smith labels to the modesty panels of its computer tables.[8] While clearly labeling the tables is certainly useful, Bretford misses the point when it identifies this as the "cornerstone of defendant's argument." *See* Plaintiff's Motion to Strike, at 1. The cornerstone of Smith's argument is that, because computer tables are generally purchased through dealers, in a process that involves looking at catalogs or samples, soliciting bids,[9] and generating pur-

---

8. Again, Bretford disputes when (or whether) Smith began to label its computer tables, but its private investigator's photos do not necessarily contradict Smith's statement as to when it started labeling the tables, or when it increased the size of the labels.

9. In his deposition, Frank Kemner, plaintiff's witness and a dealer in both Smith and Bret-

chase orders and sales documents that typically bear the manufacturer's name and logo, and finally receiving the products in marked boxes, there is no way that a customer would be confused about where the tables were coming from, if they cared in the first place. *See Syndicate Sales,* 192 F.3d at 636, citing 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.5, at 23–16 to 23–17 (1999) ("Customers who do not care about the source of goods are not considered in the determination whether there is a likelihood of confusion.")

We agree with plaintiff that this case differs from *Syndicate Sales* to the extent that *Syndicate Sales* turned on the distinctiveness of the packaging in which the baskets ultimately arrived. Here, it does not appear that the institutional representatives who make the purchasing decisions are usually responsible for unloading or assembling the tables. Therefore, the packaging is less important here than it could be in other situations. Throughout the industry's sales process, however, the tables are distinguishable. Further, there are numerous points in the process where customers can identify and ensure that they purchase a specific manufacturer's table if they wish.

Plaintiff also argues that dealer catalogs may sometimes be misleading because manufacturers do not have control over how their merchandise will be featured. In one dealer catalog. Bretford's table appears without identification, and, in another, Bretford argues that its name is buried in fine print. Smith's President states that, "Smith is careful to instruct resellers of its goods to identify Smith as the manufacturer in their catalogs." *See*

Third Declaration of Charles Risdall, at ¶ 3. Bretford does not dispute Risdall's statement. It offers evidence of its own tables being shown in catalogs without identification, not Smith's tables.

### 3. Area and Manner of Concurrent Use of Parties' Trade Dress

There is no dispute that the area and manner of concurrent use of the parties' products is similar.

### 4. Degree of Care by Purchasers

■ To evaluate this factor, we consider the sophistication of the customer with respect to the goods in question to determine whether consumers are likely to be confused in making a purchasing decision. Defendant relies on *S. Indus. v. JL Audio, Inc.* 29 F.Supp.2d 878, 892 (N.D.Ill.1998) for the proposition that because the products in question are fairly expensive, purchasers exercise care when they make purchasing decisions. Given the nature of institutional budgets, and the bidding process, it is likely that consumers are fairly careful to determine that the tables will meet their needs.

Bretford argues that institutional representatives are not sophisticated purchasers, citing the testimony of its own director of sales: "[I]f the table looks good or matches the existing furniture in the school, and the price is within budget, then an end-user is satisfied." *See* Plaintiff's Reply Memorandum of Law In Support of Its Motion For Summary Judgment, at 9, citing Plaintiff's Appendix, Tab 10, at ¶ 11. As discussed earlier, however, customers who do not care about the source of their goods are not considered in a likelihood of confusion analysis.[10] *See Syndicate Sales,* 192 F.3d at 636.

ford products, stated that when he returns his bids to institutional users he does not reveal the manufacturer of the furniture he will provide unless the institutional end-user requests that information, presumably because it prevents the customer from going directly to the manufacturer or to another dealer to beat his price. *See* Plaintiff's Memorandum of Law In Opposition To Smith's Motion for Summary Judgment, at 9. He does not state that these customers mistakenly purchase a different

brand of table than the one they wanted, nor does he state his impression of whether these customers care what type of table they receive. Further, Kemner does not dispute that the purchasing/shipping documents plainly reveal the manufacturer of the tables.

10. To the extent that dealers are considered "purchasers" we believe there can be no issue as to whether they are sophisticated.

## 5. Actual Confusion

■ The parties dispute whether confusion must be shown with respect to an actual purchasing decision or not. We decline to address that legal point specifically because we need not: Bretford's evidence of actual confusion is weak at best.[11] The first instance allegedly occurred in the context of the Dallas Independent School Systems bid when the dealer who had bid to supply Bretford CONNECTIONS tables asked the school's representative what was being used instead of Bretford. When shown what was being used, he thought it was a Bretford table. But the school's representative told him it was not, quickly dispelling any confusion. Bretford also provides the affidavit of another Bretford dealer who saw a Smith table in a school, thought it was a Bretford table, but then realized it could not be because of its color. He asked someone at the school and was told it was a Smith table.

We recognize the Seventh Circuit's caution in *Panduit Corp.*, 138 F.3d at 297, that because "evidence of actual confusion, where it exists, is entitled to substantial weight ... the decision of how much weight such evidence should be given is the province of the fact finder, not the court on a motion for summary judgment." However, we find these affidavits to be more similar to those in *Syndicate Sales,* where the Seventh Circuit held that two affidavits provided by retailers who indicated that they did not immediately recognize the difference between the Syndicate Sales and Hampshire Paper Baskets, "did not create a material issue of fact when considered in light of other indications that

there is no likelihood of confusion, especially since retailers who care about the source of baskets can be charged with the minimal care it would take to distinguish the labeling and packaging." 192 F.3d at 638.

## 6. Intent of the Defendant to Pass Off Its Products as That of Plaintiff's

■ Smith admits to copying the V-shaped leg, claiming that it did so in the belief that Bretford did not and could not claim trademark rights in the leg configuration. *See* Memorandum in Support of Defendant's Motion for Summary Judgment, at 14. Even if this were not true, Smith is correct when it states that the relevant inquiry is not whether it copied Bretford's design, but whether it intended to pass off its FLEXLINE table as a CONNECTIONS table. In *Pampered Chef, Ltd. v. Magic Kitchen, Inc.,* 12 F.Supp.2d 785, 795 (N.D.Ill.1998), the court noted that "in fact, such use, copying and modification of such ideas, is generally permissible and forms the root of competition." *See also Thomas & Betts v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995) ("Imitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity.") (citations omitted); *cf. Samara,* 120 S.Ct. 1339, 1343 (stating that "consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves ..." as a reason for holding that product design may never be inherently distinctive). There is simply no evidence that Smith tried to pass off its table as a Bretford CONNECTIONS table.[12]

11. Bretford relies on *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 384 (7th Cir. 1976), where the Seventh Circuit acknowledged that a salesperson's confusion gave "rise to an inference that purchasers would also be confused because salespersons are more likely than customers to be familiar with the various marks on the merchandise they sell and hence are less likely to be confused." The Seventh Circuit further stated that in spite of its disagreement with the

district court on this point and two others, it might not have disturbed the decision of the district court if there had not been evidence of two consumer surveys. *Id.* at 385.

12. Bretford's "newly discovered evidence" that Smith referred to the "Bretford Table Project," *see* Plaintiff's Supplemental Brief, at 4, in planning documents still does not suggest more than that Smith copied Bretford's design, as Smith admits.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted on the issue of likelihood of confusion, and plaintiff's motion for summary judgment is denied. A status hearing is set for Wednesday, July 5, at 9:30 am.