**BARBECUE MARX, INC., Plaintiff,**

v.

**551 OGDEN, INC., Defendant.**

**No. 00 C 3433.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 10, 2000.

Max Shaftal, Shaftal & Associates, Ltd., Chicago, IL, for Barbecue Marx Inc, plaintiff.

Kevin Tottis, Attorney at Law, Chicago, IL, for 551 Ogden Inc, defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Barbecue Marx, doing business as "Smoke Daddy" barbecue restaurant, moves for a preliminary injunction preventing 551 Ogden, Inc. from using the name "Bone Daddy" for the barbecue restaurant it intends to open less than one mile and a half away. For the reasons stated herein, I grant the motion.

### I.

Since opening its doors at 1804 West Division Street in Chicago, Illinois, in August of 1994, Smoke Daddy has served up hefty portions of its Texarkana barbecue to all comers. Business developed slowly, but Smoke Daddy has now reached a level of critical acclaim and some notoriety, having received very favorable reviews in the major Chicago newspapers and restaurant guides, as well as some international and in-flight magazines. Smoke Daddy is approximately 1500 square feet and seats forty-two customers. Mark Brumbach, the owner, manager and sole shareholder of Smoke Daddy, estimates that his customers number 30,000 annually and include people from the immediate and Chicagoland area, as well as from other states and countries, and have included some celebrities. Although Smoke Daddy originally advertised, it is now well-known enough so that it no longer engages in paid advertising, with the exception of free matches and postcards imprinted with the Smoke Daddy logo. Mr. Brumbach is a former professional musician, and Smoke Daddy has a small stage where bands (blues, jazz and rockabilly) play nightly after 10:00 p.m. Smoke Daddy serves food until 1:00 a.m.

In April of 2000, Mr. Brumbach heard that the owners of the "Twisted Spoke"— another restaurant in the area—were opening a new barbecue restaurant nearby. Shortly thereafter, he learned that the restaurant located at 551 Ogden was to

be called "Bone Daddy." One of the owners of 551 Ogden, Inc. is Mitch Einhorn, who testified at the preliminary injunction hearing. Mr. Einhorn is also a co-owner of the Twisted Spoke, which he describes as a "family biker bar" also critically acclaimed for its food. Mr. Brumbach testified that the Twisted Spoke plays X-rated films in the restaurant, and this is not contested.

Mr. Einhorn admits he was aware of the Smoke Daddy name and restaurant since 1994, having eaten in Smoke Daddy on more than one occasion. He claims the name "Bone Daddy" is based on a character in an animated film, not based on Smoke Daddy. However, Mr. Einhorn concedes that he and his partner (also his brother) discussed the similarity of the names prior to reaching a final decision but did not consult the lawyer who was assisting them with other trademark matters regarding this issue. The space at 551 Ogden is 5000 square feet and decorated with maple wood and black leather. Mr. Einhorn testified that the space will have a stage, which he claims will house open-mike amateur nights featuring poetry,[1] comedy, music and other entertainment, interspersed with professional entertainment. Mr. Einhorn anticipates that the music will be softer and more acoustic than that played at Smoke Daddy, and that no blues will be played because he does not care for the blues himself.

Mr. Einhorn and his partner have developed a full marketing plan for their restaurant which includes a signature Bone Daddy character and merchandise emblazoned with this logo. "Bone Daddy" is a pig with a cigar and a large dose of attitude decked out in a pinstriped suit and hat. The slogans used to advertise Bone Daddy include: "Ribbed for your Pleasure"[2] and

"Man, I boned a lot of pigs." Mr. Einhorn notes that he will continue to utilize this type of "irreverent advertising" to promote Bone Daddy. Mr. Einhorn and his partner plan to use the Bone Daddy trademark to market dry-rubs and barbecue sauce, other merchandise, and a line of house bourbon, like its sister restaurant the Twisted Spoke.

■ After the defendant refused to use a different name for its restaurant, the plaintiff instituted this action pursuant to the Lanham Act and state law, seeking damages and injunctive relief. A party seeking a preliminary injunction must demonstrate that: (1) it has some likelihood of succeeding on the merits; (2) it has no adequate remedy at law, (3) it will suffer irreparable harm if preliminary relief is denied; (4) the balance of relative harms weighs in the movant's favor; and (5) the public interest will not be harmed if the injunction issues. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir.1999).

II.

■ The Lanham Act protects consumers from deceptive claims about the nature and origin of products and services. *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1148 (7th Cir.1992). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides protection for trademarks. To prevail on its Lanham Act claim, a plaintiff must show that it has a valid mark and that the defendant's use of the same or similar mark is likely to cause confusion in the minds of customers. 15 U.S.C. § 1125(a); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986). Unauthorized use or infringement of a business' trade name can cause confusion in the minds of customers and may result in a

---

**1.** In a dining room with 25 feet ceilings, the thought of quiet poetry reading while people are eating is less than convincing. Mr. Einhorn claims to have consulted Marc Smith, who created and still presides over the Uptown Poetry Slam at the Green Mill in Chica-

go. The Green Mill is a renowned jazz club, however, where people listen intently to music or spoken verse, and no food is served.

**2.** This evokes such condom slogans as "ribbed for her pleasure."

loss of goodwill built up through substantial time and expense.

■ Defendants do not dispute that Smoke Daddy is a protectable trade name, nor that the plaintiff has consistently and continuously used this name to identify and promote the restaurant. Moreover, terms that are either suggestive, arbitrary, or fanciful are automatically entitled to trademark protection because they are inherently distinctive. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Based on the evidence presented at the hearing, I find Smoke Daddy to be an arbitrary or suggestive term entitled to such protection.[3] What the defendants do contend is that there is no likelihood of confusion between Smoke and Bone Daddy.

■ In determining whether a likelihood of confusion exists between trade names, I consider a number of factors, none of which are considered dispositive and the weight of which varies based on the facts, including: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) defendant's intent in selecting the mark. *AHP Subsidiary Holding Company v. Stuart Hale Company*, 1 F.3d 611, 615 (7th Cir.1993); *see also Syndicate Sales Inc. v. Hampshire Paper Corp.*, 192 F.3d 633 (7th Cir. 1999).

■ I begin with the similarity between the names. Trademarks are confusingly similar if they are similar in sound, appearance, meaning or connotation. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F.Supp.2d 815, 880 (N.D.Ill.1999) (citations omitted). There is certainly room for reasonable people to be confused between Smoke Daddy and Bone Daddy. The names are very similar, beginning with one-syllable words with a long "o" and ending with the same "Daddy" catch phrase. The Seventh Circuit has held phonetic similarity compelling. *See G.D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385 (7th Cir.1959) (holding that slight differences in the sounds of similar trademarks dramamine and bonamine will not protect the infringer). The defendant claims that the trade name is weak and distinguishable because "Daddy" is used frequently in restaurant names and provides a study of phone listings to that effect. While this is relevant, I review the names as a composite, and here the phrases are strikingly similar. The first words are both important parts of the barbecue process and evoke the same imagery of slow cooked, smoked barbecue, usually ribs on the bone. The names, taken as a whole, sound remarkably similar and conjure up the same images. There is a reasonable likelihood that people will be confused or recommend one restaurant while meaning the other. In addition, customers may well believe that the two are affiliated in some way, *e.g.* by common ownership. If this is the case, any actions taken by Bone Daddy will have an impact on Smoke Daddy. Smoke Daddy may be tied to the Twisted Spoke as well, which may hurt its reputation due to the pornographic films displayed in the "family biker bar."

Other factors weigh in favor of granting an injunction as well. The parties will serve the same product, i.e. barbecued food, in the same neighborhood and to many of the same customers. The defendant claims that Bone Daddy is in River West while Smoke Daddy in the adjacent Wicker Park neighborhood. Although realtors and community leaders are currently engaged in a process of assigning and reassigning names to certain locations to market them, the fact is that the restaurants are very close to each other, a mere

---

**3.** Mr. Brumbach claims the name is unique and does not mean anything; he made it up based in part on a blues song and an old roadster.

1.4 miles apart. They draw customers from the same area and pull those outside the area into the neighborhood. Although a careful patron might look up the address, write it down, and follow directions, some others might hop in the car or a cab and wing it—perhaps to the wrong restaurant.

■ The defendant makes much of the fact that plaintiff has not performed any surveys or presented social science evidence of actual confusion.[4] While it is true that a Lanham Act plaintiff may prove a likelihood of confusion through survey or other evidence of actual confusion, he may also use "[a]rgument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace." 3 *McCarthy on Trademarks and Unfair Competition*, §§ 23.20[2], 23.01[2] (3d ed.1994). Moreover, it is well settled that a plaintiff need not present evidence of actual confusion or a consumer survey to obtain a preliminary injunction. *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1070 (7th Cir.1992); *Lois Sportswear, USA Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986) ("It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion."). This makes sense in a case like this, when the restaurant has not opened, so harm can be stopped before it starts and before significant costs have been incurred. *Standard Oil Co. v. Standard Oil Co.*, 56 F.2d 973 (10th Cir.1932) ("One does not have to await the consummation of threatened injury to obtain preventive relief.").

I therefore conclude that the plaintiff has shown a likelihood that the Bone Daddy name will create consumer confusion: both businesses are restaurants with entertainment that specialize in barbecue and offer other similar food items; Smoke Daddy is an established restaurant in Chicago, while the Bone Daddy is a start-up venture with an uncertain opening date; and the two restaurants are located only 1.4 miles apart from one another. It is also reasonable to conclude that Bone Daddy, by choosing a strikingly similar name and evocative image as Smoke Daddy, intended to capitalize on Smoke Daddy's success. For purposes of obtaining a preliminary injunction, Smoke Daddy has met its burden of demonstrating a reasonable likelihood of prevailing on the merits.

■ Smoke Daddy has also satisfied the other requirements necessary for the issuance of a preliminary injunction. The lack of an adequate remedy at law and irreparable harm are generally presumed in trademark infringement cases. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091–1092 (7th Cir.1988); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir.1987). Having concluded that reasonable customers could confuse Smoke Daddy with Bone Daddy or believe they are under common ownership, I find credible plaintiff's testimony that if Bone Daddy chooses to show X-rated films like its sister restaurant or use sexually suggestive, "irreverent" advertising ("boning pigs" etc.) this could certainly be associated with Smoke Daddy and is a legitimate concern. Smoke Daddy may suffer harm not only from lost customers but also a loss of goodwill if its consumers are sufficiently confused so as to lose confidence in Smoke Daddy and its products. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982); *Health o meter, Inc. v. Terraillon Corp.*, 873 F.Supp. 1160. 1175 (N.D.Ill.1995).

This harm certainly outweighs the potential harm suffered by the defendant if it is prohibited from using the Bone Daddy name, namely the cost of coming up with a

---

4. Mr. Brumbach did testify that defendants' counsel confused the two names during his deposition.

new concept; moreover, any the defendant brought any harm it will suffer from the injunction on itself. *International Kennel Club of Chicago, Inc. v. Mighty Star Inc.,* 846 F.2d 1079, 1091 (7th Cir.1988). Mr. Einhorn admits that he and his partner were well aware of Smoke Daddy—and indeed recognized the similarity with Bone Daddy—and chose to proceed anyway. They also declined to consult with their experienced trademark attorney engaged to work on the Twisted Spoke trademark until well after their decision.[5] Mr. Einhorn was able to quantify the time and expenses which would be incurred in changing the name, and they are relatively minor, given the time and capital previously invested and the restaurant's uncertain opening date. The defendant cannot therefore claim it will suffer more hardship than Smoke Daddy, which spent six years building its trade name and goodwill. Finally, there is no basis for finding that an injunction in this case will harm the public interest.

I will therefore GRANT plaintiff's motion for a preliminary injunction preventing the defendant from using the name Bone Daddy on any signage, advertising, merchandise or in any other manner until this case is decided on the merits.

---

5. Nor do I find Mr. Einhorn's testimony that he has no backup plan or that this will be a great harm credible. Mr. Einhorn demonstrated on the witness stand that he is a sophisticated and creative restauranteur, who has spent great time and effort planning and dealing with many setbacks during the process of opening his new restaurant; he is on top of every last detail of the organization, including recipes, lighting, and design, and I am certain that he can come up with a new name if need be.